MASSEY *v.* POTEAU TRUCKING COMPANY.

4-9991                                    254 S. W. 2d 959

Opinion delivered February 16, 1953.

*Robinson & Edwards,* for appellant.

*Shaw, Jones & Shaw,* for appellee.

GRIFFIN SMITH, Chief Justice. The question is whether—as a matter of law based, as it is contended, on undisputed facts—an injured workman who sought compensation under Act 319 of 1939, as amended, (and whose claim was rejected by the commission and circuit court) was an employe of a sub-contractor; or, conversely, was he engaged to do a specific task according to his own methods, without being subject to control except as to results? See *Ice Service Company* v. *Forbess,* 180 Ark. 253, 21 S. W. 2d 411, cited in *Hobbs-Western Company* v. *Carmical,* 192 Ark. 59, 91 S. W. 2d 605.

Leonard W. Massey filed his claim alleging accidental injuries within the meaning of the Compensation Act while the relationship of employer and employe existed in respect of duties owed Poteau Trucking Company in 1950.

Ben M. Hogan Company held a state highway department contract to surface part of Highway 59 north of Van Buren. Arkhola Sand & Gravel Company maintained a mixing plant at Van Buren and sold the prepared asphalt to Hogan; and Hogan, in turn, arranged with Poteau to transport the mixture to the point of use. Necessarily, as construction progressed, distance from Arkhola to the point of application increased. Hogan's haulage commitment was to pay Poteau five and a half cents per ton mile. Nature of the so-called "mix" required prompt delivery, but Arkhola's production capacity varied as water content of the sand it utilized increased or decreased. Poteau, domiciled in Oklahoma, sent five of its trucks for use in delivering the material.

Certain local truckowners sought procurement of contracts when it became apparent that Poteau would be unable to handle maximum needs, and these truckers were at times permitted to participate in deliveries. One so employed was Massey, and the commission found from competent evidence that as owner of a truck he did public hauling.

The testimony indicates that the local truckowners persistently applied for positions at the chute where the mixture was supplied, and during a period of several days some were permitted to take loads—an operation supervised by a highway department inspector. An Arkhola representative acted with this employe. A requirement was that the inside of truck bodies be treated with a lubricant to prevent asphalt from adhering. Initially this lubricant was furnished by Arkhola, but when its supply became exhausted a drum belonging to Poteau was utilized. Another "must" was that each load be covered with a tarpaulin. In the case here Massey furnished his cover.

A commission finding is that Poteau did not repair any of the local trucks, but its auto mechanic supervised the five it owned and kept them in order. Drivers of these trucks were paid salaries computed on an hourly basis from which social security charges and other mandatory deductions are shown.

When appellant's truck was loaded he took it to scales maintained by the City of Van Buren. Through state arrangements local truckers would obtain triplicate tickets showing tonnage. A copy or original was delivered to Arkhola, Hogan, and the trucker. Massey forwarded his accumulated tickets to Poteau and received payment at four and a half cents per ton mile. This gave Poteau a *prima facie* profit of one cent per ton mile. Massey was paid $122.12 without deductions for social security or otherwise.

In addition to Massey's operations, six other truckers did hauling on the Hogan job, receiving pay checks from Poteau ranging from $69.11 to $646.48.

Massey's accident occurred late August 15th after he had delivered his load. In returning to Van Buren his truck slipped or skidded, then overturned. A sentence in the commission's statement of the case is that "The evidence is in conflict whether the claimant was on his way home or whether he was on his way back to the mixing plant". The factual finding is that Massey was not Poteau's employe when the injury occurred.

Was Massey an employe of Poteau, the sub-contractor?

The rule for determining which of the two relationships exists is that if there is nothing in the contract showing an intent upon the part of the employer to retain control or direction of the manner or methods by which the party claiming to be independent shall perform the work, and there is no direction relating to the physical conduct of the contractor or his employes in the execution of the work, the relation of independent contractor is created. The governing distinction is that if control of the work reserved by the employer is control not only of the result, but also of the means and manner of the performance, then the relation of master and servant necessarily follows. But if control of the means be lacking, and the employer does not undertake to direct the manner in which the employe shall work in the discharge of his duties, then the relation of independent contractor exists. *Moore and Chicago Mill & Lumber Company* v. *Phillips,* 197 Ark. 131, 120 S. W. 2d 722.

A decision where the facts are strikingly similar to those here is *Wren* v. *D. F. Jones Construction Company,* 210 Ark. 40, 194 S. W. 2d 896. Wren's widow claimed compensation for her husband's death and the defending construction company denied that Wren was its servant. The court's opinion is summarized in Headnote No. 9: "Where the deceased was engaged to haul gravel for appellee at $3 per load, appellee loading the truck and showing the deceased where to dump the gravel, the finding by the commission that the deceased was an independent contractor is supported by substantial evi-

dence". The opinion calls attention to *Parker Stave Co.* v. *Hines,* 209 Ark. 438, 190 S. W. 2d 620, where it was said that in determining whether one claiming benefits is an employe or an independent contractor the compensation Act must be given a liberal construction in favor of the workman, "and any doubt is to be resolved in favor of [the claimant's] status as an employe rather than an independent contractor".—*Irvan* v. *Bounds,* 205 Ark. 752, 170 S. W. 2d 674.

But we have consistently held that no rule of unvarying application can be formulated for ascertaining whether a workman is a servant or an independent contractor, "and each case must be determined upon its own peculiar facts".

Mr. Justice R. W. Robins wrote a strong dissenting opinion, pointing to his disagreement with the majority's findings in the Wren-Jones case. He was joined by Mr. Justice Millwee. The dissent emphasizes this court's duty to adjudge whether the evidence is undisputed, but in considering the factual structure, including reasonable inferences, there must be a "liberal" construction.

"Liberal construction", as judicially applied under legislative mandates dealing with remedial rights, has a somewhat dubious connotation. The phrase cannot, of course, mean that a court is to take liberties with what one litigant is entitled to at the expense of another, yet this would seem to be the meaning of language found in *Glen Falls Portland Cement Company* v. *Van Wirt Construction Co.,* 228 N. Y. S. 289, 299, 132 Misc. 95. The court there said: "The required liberal construction means a construction in the interest of those whose rights are to be protected". We prefer the more reasonable definition by Mr. Justice Fairchild of the Wisconsin Supreme Court, *State, ex rel. Mueller* v. *Common School Board,* 208 Wis. 257, 242 N. W. 574, who said that liberal construction consists in giving statutory words a meaning "which renders [the Act] effectual to accomplish the purpose or fulfill the intent which it plainly discloses".

Excerpts from selected cases dealing with liberal construction are to be found in Words and Phrases, v. 25, pp. 118-19. Some of the expressions are: "[The] term 'liberal construction' means to give statutory language its generally accepted meaning, to the end that most comprehensive application thereof may be accorded, without doing violence to any of its terms". *Maryland Casualty Co.* v. *Smith,* (Texas) 40 S. W. 2d 913. And again: "Liberal construction does not mean enlargement or restriction of any plain provision of law. If a statutory provision is plain and unambiguous, it is the duty of the court to enforce it as it is written. If it is ambiguous or doubtful, or susceptible of different constructions or interpretations, then such liberality of construction may be indulged in as, within the fair interpretation of its language, will effect its apparent object and promote justice". *In re Johnson's Estate, 33* P. 460, 466, 98 Cal. 531, 21 L. R. A. 380; *In re Jessup,* 22 P. 742, 745, 81 Cal. 408, 6 L. R. A. 594.

So here, in construing an individual's rights under the Workmen's Compensation Law, the clear purposes of the Act must be enforced, and the legislative intent should be ascertained from what is written; but where obscurity of expression and inept phraseology appear and a restrictive construction would have the effect of defeating praiseworthy purposes that undoubtedly actuated the lawmaking body, then resort may be had to the rule of liberal construction in furtherance of a composite whole.

Appellant's counsel discuss the testimony of Poteau's foreman to the effect that if Massey had refused to do something asked of him he would have been discharged. It has been held that "the right to hire and fire" may be *considered* in ascertaining whether the relationship is that of independent contractor or master and servant. However, it is not conclusive unless from all transactions the fact-finders decide that reservation of this right is tied with control of means or methods whereby the work is done, and then only if the right of discharge may in reason be said to influence physical operations. Here

the foreman thought that the duty enjoined upon Massey and other local carriers was of such a simple nature that directions were dispensed with—not even considered; and assuredly, when the truck overturned, Massey was in full control uninfluenced by any directions as to speed, road conditions, or other factors that conceivably could have contributed to the accident.

Section 6 of Act 319 of 1939 was discussed in an opinion written by Mr. Justice Leflar, *Brothers* v. *Dierks Lumber & Coal Co.*, 217 Ark. 632, 232 S. W. 2d 646. Although the decision was in 1950, the cause of action originated in May, 1948. Initiated Act No. 4, (now § 81-1306, Ark. Stat's, Supplement) became effective in 1949.

The record discloses an agreement that the Hogan Company and its liability carrier should be dismissed.

Initiated Act No. 4, Ark. Stat's, § 81-1306, makes the prime contractor liable where a sub-contractor fails to secure compensation. The section, in part, reads: "Any contractor or his insurance carrier who shall become liable for the payment of compensation on account of injury to or death of an employe of his sub-contractor may recover from the sub-contractor the amount of such compensation paid or for which liability is incurred. The claim for such recovery shall constitute a lien against any moneys due or to become due to the subcontractor from such prime contractor. A claim for recovery, however, shall not affect the right of the injured employe or the dependents of the deceased employe to recover compensation due from the prime contractor or his insurance carrier".

With elimination of Hogan we deal only with Poteau and the compensation carrier. The case was tried upon the correct assumption that Poteau had a right to employ a servant or an independent contractor, and in view of facts to which the commission pointed we are unable to say there was no substantial basis for the determination

it made. This being true circuit court did not err in refusing to disturb the order.

Affirmed.